

U.S. Department of Justice

United States Attorney
Eastern District of New York

CAO/SSS  
F. #2013R01274

*271 Cadman Plaza East*  
*Brooklyn, New York 11201*

May 26, 2016

# REDACTED, UNSEALED SENTENCING MEMORANDUM[1]

By Hand and ECF

The Honorable Eric N. Vitaliano  
United States District Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

   Re: United States v. Sandy Winick  
      Criminal Docket No. 13-452 (ENV)

Dear Judge Vitaliano:

  The government respectfully submits this letter in opposition to the defendant Sandy Winick's letters dated May 9, 2016 ("Def. Memo") and February 3, 2016 ("Def. Objections"). The Presentence Report ("PSR") concludes that Winick's sentence should be within the advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 87 to 108 months. Winick requests a time served sentence. For the reasons set forth below, the government submits that Winick is not a candidate for a reduced sentence and that the Court should impose a term of incarceration within the 87 to 108 month range recommended by both the Guidelines and by the Probation officer.

  As to Winick's objections to PSR paragraphs 69 and 72, the government submits that, for substantially the same reasons set forth in the March 29, 2016 PSR addendum, the objections should be overruled. Winick is scheduled to be sentenced on July 14, 2016.

---

  [1] On May 26, 2016, the government filed a sealed sentencing memorandum. The government, after redacting the earlier memorandum, hereby files this unsealed version of the same memorandum.

I.      Background

      A.  The Advance Fee Scheme

As detailed in the PSR, the defendant was involved in an advance fee scheme with Kolt Curry, Gregory Curry and Gregory Ellis between January 2009 and July 2013. PSR ¶ 14. The defendants fraudulently solicited investors in penny stocks to pay advance fees that purportedly would enable the victims to sell their nearly worthless penny stocks at a profit. PSR ¶ 15. The defendants invented non-existent businesses to convince the victims to pay fees in advance of selling the securities. Id. The fake companies included fake law firms that solely existed to serve this scheme. PSR ¶ 15. The defendants maintained calling centers in Vietnam, Thailand and Canada and intended to open an additional calling center in Brooklyn, New York. PSR ¶ 17. On recorded phone calls, Winick actually discussed how he was recruiting people to run these call centers. Id. The victims lived in countries throughout the world, and multiple calls were made to Brooklyn, New York. Id.

The defendant was a Canadian citizen and lived, at various times in Thailand, Vietnam and Canada. PSR ¶ 29. The defendant did not personally make the phone calls to the victims. Those phone calls were made by others, who were acting at his direction. PSR ¶ 18. The defendant is responsible for at least $5,000,000 in losses to victims. PSR ¶ 26.

Although the defendant did not personally make the false statements to the advance fee victims, it is worthwhile to know the nature of the lies in this scheme. The callers falsely claimed to represent unidentified (and non-existent) buyers interested in purchasing worthless penny stocks at an attractive price. PSR ¶ 18. The callers would falsely represent that the victims needed to pay a fee for a legal opinion before the sale could be consummated. Id.

If the victim fell for the "law firm fee," the callers contacted the victim purportedly as representatives for yet another fake law firm that was suing the penny stock companies for fraud. Id. To join the law suit, the victim would yet again have to pay a fee. Id.

Finally, the callers would call yet again to indicate that the victim could receive extra stock warrants if they first paid a fake warrant conversion fee and a fake Internal Revenue Service ("IRS") fee. PSR ¶¶ 20, 22-23. The scheme even went so far as to create fake IRS letterhead and documents. PSR ¶ 22.

The fake law firms were established by Winick, who also established phone numbers for the fake law firm that used California area codes but were actually routed through a "call center" to ring in Thailand and elsewhere. Winick even created a fake website for the fake law firm.

For his above-described conduct, on July 17, 2015, the defendant pleaded guilty to Count Three of the second superseding indictment, in violation of wire fraud conspiracy. PSR ¶ 1. The defendant's advisory Guidelines range is 87 to 108 months. See PSR ¶¶ 67-78, 108.

B. <u>Pump-and-Dump Scheme</u>

The defendant pleaded guilty to the advance fee scheme, not the securities fraud scheme. The government includes a discussion of the pump-and-dump scheme because it speaks to the defendant's character. Where the defendant requests a substantial variance from a Guideline sentence – to a time-served sentence, the defendant's overall character is clearly at issue.

As detailed in the PSR, the defendant was involved in a penny stock pump-and-dump scheme with Gary Kershner, Songkram Roy Sahachaisere, William Seals and others between January 2008 and July 2013. PSR ¶ 5. The defendants fraudulently inflated and attempted to inflate the share prices and trading volumes of certain penny stocks. PSR ¶ 6. After doing so, the defendants then sold the stocks at a profit after their fraudulent conduct deceived investors into believing that market forces alone set the stocks' artificially inflated share prices and trading volumes. <u>Id</u>. To conceal their control and distribution of the stocks from regulators and investors, the defendants often falsely reported to brokerage firms the means by which they acquired the stocks and deposited stocks into accounts held by nominee entities. PSR ¶ 8.

The defendants promoted the stocks using email blasts, chat rooms, social networking sites, message boards, stock touting websites and newsletters that contained false and misleading information and press releases and did not accurately disclose the interest of the promoters or defendants in the stocks. PSR ¶¶ 9, 11. The defendants coordinated trading activity with the issuance of false and misleading press releases to create market interest and inflate the share prices and trading volumes. PSR ¶ 10. Many of the calls and emails used to coordinate the false and misleading statements were directed toward or emanated from a cellphone in Brooklyn, New York. PSR ¶ 14. Winick and his co-conspirators also used stolen and invented identities to promote the Target Stocks. PSR ¶ 9.

The defendant, a Canadian citizen who lived in Thailand and other places during the scheme, was the apex of this criminal organization. PSR ¶¶ 29, 51-52.

II. <u>Sentencing</u>

A. <u>The Guidelines Do Not Overstate the Seriousness of Winick's Crimes</u>

The defendant begins his sentencing submission with the argument that the fraud sections of the Guidelines overstate the seriousness of his crimes. Def. Memo at 1-4. This is not true. If anything Winick's criminal liability is understated by the Guidelines.

All of the Guidelines criticisms cited in the defendant's sentencing memorandum flow from the view that the Guidelines give an overly expansive, inflated calculation of fraud defendants' liability. However, as noted above, Winick orchestrated two enormous international fraud schemes. By the virtue of his attorney's skillful advocacy, he received a plea agreement that solely required him to plead guilty to the one count. Winick's Guidelines calculations for this sentencing hearing are similarly confined to solely the advance fee scheme. Therefore, the

Guidelines, while the result of a fairly negotiated plea agreement, give an artificially constrained rather than overly expansive view of Winick's liability.

When the facts of this case are placed in the context of the Section 3553(a) factors, it is evident that:

(1) the offense, which involved two international multi-million dollar fraud schemes based out of multiple countries and victimized hundreds of victims[2], was very, very serious, 18 U.S.C. § 3553(a)(1);

(2) the defendant, who led these two international schemes and has been involved with international securities fraud for his entire adult life, is not a man of exemplary character, 18 U.S.C. § 3553(a)(1);

(3) an extremely serious crime requires a significant sentence, 18 U.S.C. § 3553(a)(2)(A);

(4) an extremely serious crime requires a significant general deterrence to the public, 18 U.S.C. § 3553(a)(2)(B);

(5) an extremely serious crime requires significant specific deterrence to the Winick, who has not held any position but as a fraudster for years, 18 U.S.C. § 3553(a)(2)(B); and

(6) the public must be protected from a fraudster as prolific as Winick. Indeed, Winick's activities victimized the entire world for years on end. 18 U.S.C. § 3553(a)(2)(C).

In short, the government submits that no below-Guidelines sentence could adequately address the Section 3553(a) factors for this defendant.

B.  The Number of Victims Enhancement is Properly Applied in PSR ¶ 69

The government concurs with both the PSR and Winick that only a "+2" should be applied to the offense level. See PSR ¶ 69; USSG § 2B1.1(b)(2)(A). The amendments to the Guidelines make it clear that although there were hundreds of victims, the mass-marketing of the crime only results in the lower enhancement.

C.  Winick's Role is Properly Applied in the PSR ¶ 72

Winick next argues that he should not receive an enhanced role. Def. Memo at 5-6. In broad strokes, he argues that the idea originated with Kolt Curry and that he should not receive a role enhancement greater than Kolt Curry. The government disagrees.

---

[2] Thousands of victims were injured by the pump and dump scheme.

4

To defraud victims, Winick bankrolled the establishment of multiple boiler rooms throughout the world. These boiler rooms were managed by people selected by Winick. In fact, Winick purposefully chose people other than Kolt Curry (such as co-defendant Gregory Ellis) to manage those boiler rooms because Kolt Curry could not be trusted with that level of managerial responsibility. Dozens of callers populated these boiler rooms. The fake law firms, websites and phone numbers were established when Winick directed others to create deceptive entities and communications. The boiler rooms would then use those tools, from multiple locations bankrolled by Winick to execute the advance fee scheme. Finally, Winick had the ultimate responsibility for determining all distributions of fraudulent proceeds. Against that backdrop, the government submits that it is clear that Winick was the leader of a criminal organization that was extensive. As such, the PSR correctly provides an upward adjustment of 4 levels under the Guidelines. See PSR ¶ 72; USSG § 3B1.1(a).





E.   General Purposes of Sentencing

Title 18, United States Code, Section 3553(a) requires the sentencing court to consider the general purposes of sentencing, including: "the need for the sentence imposed- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Gall v. United States, 128 S. Ct. 586, 597 n.6 (2007).

Here, the defendant controlled two serious and complex fraud schemes that involved thousands of victims (hundreds of victims in the advance fee scheme and thousands of victims in the pump and dump scheme). Accordingly, a sentence of incarceration within the Guidelines range is needed to send a strong message of deterrence to the general public and to

adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the defendant.

    F.    <u>Restitution</u>

On March 22, 2016, the government filed a letter setting forth its position as to restitution. Winick has not objected to that proposed restitution order.

III.    <u>Objections</u>

The government has no further objections to the PSR. For the reasons set forth in sections II(B) and II(C) above, the government opposes Winick's objections and to PSR paragraphs 69 and 72.



IV.      Conclusion

        Sandy Winick is not a typical fraud defendant in any way. For one, he sat at the apex of two enormous international fraud schemes. These schemes victimized thousands of people. For another, due to the skilled advocacy of his attorney, Winick enjoys the benefit of pleading to only one of his many fraud schemes. ███████████████████████████████
████████████████████████████████████████████████████████████████████████████████████
████████ For the foregoing reasons, the government respectfully submits that the Court should sentence Winick within the advisory Guidelines range of 87 to 108 months.

                                      Respectfully submitted,

                                      ROBERT L. CAPERS
                                      United States Attorney

                      By:    /s/
                                      Christopher A. Ott
                                      Assistant U.S. Attorney
                                      (718) 254-6154

cc:    Richard Rosenberg, Esq. (by ECF and email)
       U.S. Probation Officer Patricia A. Sullivan (by email)